# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                           **CASE NO. 5:12-cr-5-RS**

**DAVID ISAAC RUCKER,**

    **Defendant.**
_____/

## ORDER

On May 31, 2012, a hearing was held on Defendant's Motion to Suppress (Doc. 80). After considering the testimony of the witnesses and arguments from counsel, Defendant's motion is **DENIED**.

## Background

Around September 2011, the United States Drug Enforcement Agency ("DEA") began investigating a drug-trafficking organization, known as the Knowles Drug-Trafficking Organization ("Knowles DTO"). This organization acquired, transported, and distributed cocaine in the Bay County, Florida area. Twelve people indicted, including Defendant, in this case for their involvement with the Knowles DTO.

On October 3, 2011, Freddie Lee Christopher Knowles, IV ("Knowles") was pulled over for a traffic stop by Baldwin County Sheriff's Office in Loxley,

1

Alabama. During the stop, Knowles consented to a search of his vehicle, which resulted in his arrest and the seizure of $118,500.00 United States currency. Knowles was subsequently interrogated by law enforcement when he revealed that he was traveling from Panama City, Florida to Jackson, Mississippi to purchase three kilograms of cocaine from his source of supply. The source of supply was later identified as Kelvin Rucker. According to Knowles, Kelvin Rucker would direct drug couriers to transport cocaine from the Houston, Texas, area to Jackson, Mississippi, where it would be further distributed.

In October and November of 2011, DEA utilized a confidential source ("CS") to contact and arrange for a sale of cocaine to Fagin, one of the Knowles DTO distributors. During the controlled purchase, the CS and Fagin discussed acquiring additional cocaine from Knowles and Walker. Walker is Rucker's girlfriend and is a drug courier for the Knowles DTO. On December 8, 2011, the CS made another controlled purchase for DEA.

DEA also obtained phone tolls for the phones of Knowles, Fagin, and Walker. The phone tolls revealed that Walker made eleven trips to Mississippi between October 23, 2011, and February 5, 2012. Each of these trips was made on a Sunday.[1] Walker would leave Panama City, Florida, early Sunday morning and return later that evening.

---

[1] On one occasion, Walker made the trip in two days—leaving on November 6, 2011, and returning on November 7, 2011. This was the only trip not made within one day.

In January and February 2012, DEA agent Brian Lammers obtained court orders authorizing Title III intercepts on two of Fagin's phones and a phone of Knowles. Law enforcement was able to obtain information about Walker's trips to Mississippi, including the February 12, 2012, trip. Additionally, on February 11, 2012, law enforcement intercepted calls about collecting money from various distributors by the end of the night, which was before Walker's usual Sunday trip the next day. Defendant was never recorded in any of the calls, and his name was never mentioned.

Early on February 12, 2012, DEA agent Lammers and other law enforcement personnel established surveillance on the residences of Knowles and Walker. At approximately 7:00 a.m., Walker left Panama City and drove to Jackson, Mississippi, stopping three times for gas. Law enforcement followed Walker on the ground, and when Walker arrived in Jackson, aerial surveillance began by DEA task force officer Ricky Clark. Clark maintained communication with the ground surveillance team.

Around 12:45 p.m., Walker arrived at the Metro Mall in Jackson and parked in a sparsely occupied section of a Sears parking lot. Walker remained in her car for approximately eight minutes before a black Pontiac Grand Am pulled in front her. After running the license plate, law enforcement determined that the vehicle belonged to Defendant. Walker then followed the Grand Am in tandem for eleven

3

minutes and arrived at 777 Ewing Street. Walker then backed her car under the carport and was blocked in by the Grand Am. Clark observed a black male wearing a tan jacket (later identified as Defendant) exit the Grand Am. About twenty minutes later, Clark observed the same black male get back into the Grand Am and pull out of the carport. Walker's car followed in tandem.

As the vehicles were driving away from the residence, law enforcement personnel pulled in front of and behind the cars. Law enforcement stopped the two vehicles, ordered Walker and Rucker out of their cars, handcuffed them, and secured them on the ground. Task force officer ("TFO") Brett Bertucci asked Defendant if he had any weapons, and Defendant responded that he had a gun in his pocket. Agents Lammers and Bertucci assisted Defendant off the ground and removed a loaded 9mm handgun from his pocket.

Shortly after Walker and Defendant were secured, DEA special agent Gonzalez advised them of their Miranda rights, but neither asked for an attorney. Agent Gonzalez requested permission to search the vehicles. Walker granted law enforcement permission to search her vehicles; however, Defendant refused the request.

At this time, Agent Gonzalez requested that Mississippi Highway Patrol utilize a narcotic K-9 to conduct a free air sniff outside the vehicles. Trooper Christopher Walker ("Trooper Walker") used his K-9, Mugge, to conduct the free

4

air sniffs on the vehicles. First, Mugge conducted a free air sniff of Walker's vehicle and received a position alert for the odor of narcotics. Mugge then conducted a free air sniff around Defendant's vehicle and received a positive alert near the truck of the Grand Am. Because Mugge alerted for both cars, Trooper Walker asked Trooper Puckett to run his K-9, Remco, only on the Grand Am. Remco also gave a positive alert by the trunk of the Grand Am, which prompted law enforcement to search the vehicle.

During the search, Defendant was standing with Mississippi Highway Patrol Trooper Sylvester Houston, who advised Defendant that he should tell the agents if there was anything in his vehicle. Defendant responded that there was money in the trunk, but he did not have any drugs. Law enforcement recovered three blocks of United States currency totaling $106,550.00 from the trunk of the Grand Am. When being questioned further about the money, Defendant requested an attorney, and the questioning ceased. Also recovered from the trunk of the Grand Am were several different types of screwdrivers, rubber gloves, several cellular phones, and a GPS.

Defendant and Walker were arrested for conspiracy to distribute cocaine and were detained at Madison County Detention Center.

## Analysis

Defendant contend that the officers had no probable cause to arrest him, search him or the vehicle, or seize any evidence, and therefore, all evidence from the stop must be suppressed.

*Probable Cause for Arrest*

The argument the Government presented about probable cause for the arrest was that given the totality of the circumstances, there was probable cause that Defendant was involved in the conspiracy to distribute cocaine. Whether probable cause exists is determined by the facts on a case-by-case basis. *United States v. Watts,* 329 F.2d 1282, 1286 (11th Cir. 2003). Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent [person] in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111 (1975)(internal citations omitted). A reasonable basis for belief of guilt requires less than prima facie proof of guilt but more than a mere suspicion. *See United States v. $242,484,* 389 F.3d 1149 (11th Cir. 2004)(*en banc*). Additionally, courts evaluate the evidence in its totality. *United States v. Allison*, 953 F.2d 1346, 1349-50 (11th Cir. 1992).

Based on the totality of the circumstances, DEA agents had sufficient probable cause to arrest Defendant for conspiracy to distribute cocaine. At the time of the arrest, the DEA agents had several months invested in the case. They knew that the Knowles DTO was distributing cocaine to the Panama City, Florida

area via drug couriers who traveled to Jackson, Mississippi, to obatin the cocaine. From the Title III intercepts and phone tolls, DEA agents knew that Walker was a drug courier and travelled round trip from Panama City to Jackson eleven times, each time on a Sunday. The Title III intercepts also revealed that Knowles was collecting money from distributors on February 11th in preparation for Walker's trip on the 12th.

DEA agents followed Walker on the ground and from the air and observed her pull into the Sears parking lot and wait until she was able to follow Defendant's Grand Am. Defendant, although not known at the time to be involved, was later identified by Clark when he got of the vehicle after he and Walker arrived at the residence. Clark also observed Defendant getting back in the car twenty minutes later and driving away with Walker following in tandem.

Given the totality of the circumstances, an objectively reasonable officer would believe that Defendant and Walker were involved in a drug trafficking offense. Law enforcement was unable to witness any exchange of money because the vehicles purposely backed into the carport blocking the aerial and ground views. However, the information known at the time to law enforcement established sufficient probable cause for the arrest.

*Seizure of the Loaded Firearm from Rucker*

The public-safety exaction "allows officers to question a suspect without first [providing *Miranda* warnings] when necessary to protect either themselves or the general public." *United States v. Newsome,* 465 F.3d 1221, 1224 (11th Cir. 2007)(per curiam)(citing *New York v. Quarles*, 104 S. Ct. 2626, 2631 (1984)). The exception is judged under an objective standard and applies when police officers ask questions reasonably prompted by a concern for either themselves or the public. *Id.* at 1226. (internal quotations and citations omitted). Lastly, firearms are considered "tools of the trade" for trafficking drugs. *United States v. Alvarez*, 755 F.2d 830, 849 (11th Cir. 1985). In this case, the DEA agents knew that firearms were used in the Knowles DTO because of the Title III intercepts. Therefore, Officer Bertucci's inquiry as to whether Defendant had any weapons on him falls under the public-safety exception, and the seizure of the loaded 9 mm handgun was lawful.

*Search Incident to Arrest*

Defendant argued because there was no probable cause for Defendant's arrest, the subsequent search and seizure of evidence from his vehicle was also unlawful and should be suppressed. However, because I find that there was

sufficient probable cause for the arrest, the search of the vehicle and seizure of evidence was lawful as a search incident to arrest.

When an occupant of a vehicle is lawfully arrested, law enforcement can search the vehicle if it is reasonable for the officers to believe that the vehicle contains evidence of the offense of the arrest. *Arizona v. Gant*, 556 U.S. 332, 343-44 (2009). Given the totality of the circumstances leading to Defendant's arrest, it was reasonable for law enforcement to believe that there was evidence of drug trafficking in Defendant's vehicle. Therefore, the search of the vehicle and seizure of evidence was lawful.

Additionally, after considering the evidence presented at the hearing, I find that the narcotics-detection dogs are reliable and follow the Eleventh Circuit's long-standing law that law enforcement has probable cause to search a vehicle when a trained, narcotics-detection dog alerts to the presence of narcotics. *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006).

## Conclusion

Given the totality of the circumstances, an objectively reasonable law enforcement officer had sufficient probable cause to arrest Defendant for conspiracy to distribute cocaine. Therefore, the search and seizure of evidence from Defendant's vehicle was lawful as a search incident to arrest. Defendant's Motion to Suppress (Doc. 80) is **DENIED**.

**ORDERED** on June 6, 2012.

                                        <u>/S/ Richard Smoak</u>
                                        **RICHARD SMOAK**
                                        **UNITED STATES DISTRICT JUDGE**